# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND [1]

KEVIN L. JOHNSON, et al.           *
                                   *
      Plaintiffs           *
                                   *
v.                                 *         Civil No. PJM 06-2196
                                   *
KEVIN WHEELER, et al.              *
                                   *
      Defendants           *

## <u>O P I N I O N</u>

### I.

As home mortgage foreclosures have increased in recent years, so have so-called "foreclosure rescue scams." [2] Typically, a homeowner facing foreclosure is identified by a rescuer through foreclosure notices published in the newspapers or at government offices. The rescuer contacts the homeowner by phone, personal visit, card or flyer, and offers to stop the foreclosure by promising a fresh start through a variety of devices. As the date for the foreclosure approaches and the urgency of the matter becomes greater, the rescuer or some entity with which he is linked agrees to arrange for the pay-off of the mortgage indebtedness and to see to the transfer of title to the

---

[1]     Suit was originally filed in the Circuit Court for Prince George's County and was removed here by Defendants.

[2]     *See generally* STEVE TRIPOLI & ELIZABETH RENUART, NATIONAL CONSUMER LAW CENTER, DREAMS FORECLOSED: THE RAMPANT THEFT OF AMERICANS' HOMES THROUGH EQUITY-STRIPPING FORECLOSURE "RESCUE" SCAMS (2005).

property to an investor pre-arranged by the rescuer, often with a leaseback of the property to the homeowner for a period of time, occasionally giving him the right to repurchase the property after the lease ends.  The rescuer imposes heavy fees or other charges for his services, in effect stripping some if not all of the homeowner's equity, and does all this with little or no advance notice to the homeowner, who is usually unrepresented by counsel.

Kevin and Lolita Johnson believe that they were the victims of such a scam and have sued various parties to their transaction on a number of theories.

Defendants, who will be described presently, have filed various Motions to Dismiss the Complaint. [3]  Oral argument has been held on the Motions which the Court now proceeds to rule upon.

---

[3]
The Court has before it the following Motions:

Motion to Dismiss Plaintiff's Complaint by American Home Mortgage Corporation [Paper No. 25];

Motion to Dismiss or in the Alternative for Summary Judgment by Answer Title & Escrow, LLC [Paper No. 27];

Motion to Dismiss by KG Management, LLC, Kevin Wheeler, Wheeler Realty, LLC [Paper No. 32];

Amended Motion to Dismiss or in the Alternative for Summary Judgment by American Home Mortgage Corporation [Paper No. 56];

Motion to Dismiss by Patrick M. Jackson and Benita M. Jackson [Paper No. 57];

Motion to Join in Motion to Dismiss of Various Co-Defendants by Terrell L. Sheppard and TLS Management, Inc. [Paper No. 62]; and

Kevin J. Johnson and Lolita R. Johnson have filed their own Motion to Dismiss Answer Title's Counterclaim [Paper No. 39].

II.

According to their Complaint, the Johnsons were the fee simple owners of the property at 5804 Barnes Drive, Clinton, Maryland, which was subject to a Deed of Trust in favor of EMC Mortgage Corporation.  On or about February 14, 2006, they received a letter from a law firm informing them that it had been retained to pursue a foreclosure action against the property, presumably because the Johnsons were in arrears with respect to their mortgage payments.  The foreclosure sale was scheduled for March 22, 2006.  Shortly after receiving the letter, the Johnsons were "cold-called" by Terrell Sheppard of TLS Management, Inc., who represented that he was a "mortgage broker" who could secure refinancing for them and help save their home from foreclosure.  In the weeks leading up to the foreclosure sale, the Johnsons heard nothing from Sheppard, but "days before the foreclosure sale" Sheppard contacted them again and advised that he was not in fact able to arrange the refinancing.  Instead he referred the Johnsons to Kevin Wheeler of Wheeler Realty, LLC, a firm based in Fort Washington, Maryland, who he indicated could prevent the foreclosure by arranging for a sale and leaseback of their home.

The Johnsons promptly made contact with Wheeler, who they understood would be acting as their agent to sell the property.  Some time before the scheduled foreclosure sale, Wheeler arranged for Patrick M. and Benita M. Jackson to purchase the property from the Johnsons for the price of $450,000. [4]  Settlement was held almost immediately thereafter, *i.e.* on March 17, 2006, apparently at the office of Wheeler Realty in Fort Washington.  Glenda Wheeler, Esquire – Kevin

---

[4]
The Johnsons make no reference to a contract of sale in the Complaint and their counsel noted at oral argument that he was not aware of, nor had he ever seen one.  Defendants also make no reference to a contract of sale in their responsive pleadings, but counsel for Kevin Wheeler/Wheeler Realty told the Court at oral argument that there was a contract of sale and that he would supply a copy to the Johnsons' counsel.

Wheeler's sister and General Counsel and Chief Financial Officer of Wheeler Realty – conducted the settlement. Glenda Wheeler and Answer Title, the title insurer in the sale, co-rented space at Wheeler Realty for the purpose of conducting settlements. [5]

According to the HUD-1 Settlement Statement produced at settlement (which the Johnsons had not seen beforehand), American Home Mortgage Corporation was providing a first trust loan to the Jacksons in the amount of $300,000 and a second trust loan of some $67,500. After being assigned certain credits, the Jacksons were required to pay in an additional $41,614 to accomplish the transfer.

Also according to the settlement statement, with some $475,600 credits in hand from the Jacksons, Glenda Wheeler made the following distributions out of the gross proceeds attributable to the Johnsons:

a)      To EMC, the outstanding mortgage balance, accumulated interest, and associated costs, totaling approximately $210,410;

b)      To TLS Management, Inc. (Terrell Sheppard) a "service fee" of approximately $5,750;

c)      To Wheeler Realty (Kevin Wheeler) a commission of $12,500, in addition to a $1,000 deposit it had received previously;

---

[5]

The Complaint does not expressly indicate and it is not clear from the record where settlement actually occurred. The HUD-1 Settlement Statement attached to the Complaint indicates that the "Place of Settlement" was "10 G Street, N.E., Suite 410, Washington, D.C. 20002," which Answer Title claims as its location. However, in its Motion to Dismiss, Answer Title has attached a Memorandum of Understanding (MOU) between itself, Glenda Wheeler, and Wheeler Realty "concerning the providing of onsite settlement services at Wheeler Realty [in Fort Washington] by Answer Title." Thus, it appears that settlement may actually have taken place at Wheeler Realty in Maryland.

d)      To KG Management, LLC (owned by Kevin Wheeler) a management fee of $56,797;

e)      To the Jacksons, as purchasers, credits of $9,000 against their closing costs; and

f)      To Answer Title & Escrow, LLC an escrow payment of $100,000; [6]

After deducting the foregoing charges from the gross amount due them, the Johnsons received a net of $43,627 from the sale. [7]

Simultaneously with signing the deed over to the Jacksons at settlement, the Johnsons entered into a Lease Agreement with the Jacksons and KG Management, LLC to lease their home back for one year beginning as of the date of settlement, *i.e.* as of March 17, 2006.  The monthly rental was fixed at $3,500.  KG Management, LLC, of which Kevin Wheeler was the principal, was assigned the previously mentioned $56,797 fee for "managing" the property for one year.

The Deed and the Deed of Trust went to record among the Prince George's County, Maryland land records shortly thereafter. [8]

---

[6]      At oral argument Answer Title's counsel indicated that the $100,000 was intended to satisfy any liens that might be revealed as a result of the title search on the property that was to take place subsequent to settlement, no search having been conducted prior thereto.

[7]      On or about May 8, 2006, having conducted a title search and found no liens, Glenda Wheeler and/or Answer Title forwarded the $100,000 escrow to the Johnsons.  According to the Escrow Agreement the Johnsons were directed to sign at settlement, the $100,000 bore no interest and was subject to a handling charge in favor of Answer Title of at least $50.00.

[8]      The record does not reflect the exact date of recording, although the parties have proceeded on the assumption that it occurred shortly after settlement.

III.

The Johnsons contend that, in connection with this transaction, Sheppard, TLS Management, Inc., Kevin Wheeler, Wheeler Realty, Answer Title, Glenda Wheeler, and American Home Mortgage are liable to them for damages based on one or more of the following causes of action:

Count I  -  Violation of the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U.S.C. § 1961-62 (2004) (all Defendants except American Home Mortgage)

Count II - Violation of the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2607 (2004) (Sheppard, Kevin Wheeler, and Glenda Wheeler)

Count III  - Violation of the Maryland Homeowner's Protection in Foreclosure Act (HPIFA), MD CODE ANN., REAL PROP. § 7-301 to -321 (Supp. 2006) (Sheppard)

Count IV  - Violation of the HPIFA, MD CODE ANN., REAL PROP. § 7-301 to -321 (Supp. 2006) (Kevin Wheeler)

Count V  - Violation of the HPIFA, MD CODE ANN., REAL PROP. § 7-301 to -321 (Supp. 2006) (the Jacksons)

Count VI  - Violation of the Maryland Consumer Protection Act, MD CODE ANN., COM. LAW § 13-301 to -318 (2003). (all Defendants except American Home Mortgage)

Count VII  - Fraud (Sheppard, Kevin Wheeler, Glenda Wheeler and the Jacksons)

Count VIII  - Civil Conspiracy (Sheppard, Kevin Wheeler, Glenda Wheeler and the Jacksons)

Count IX   -  Conversion (Sheppard, Kevin Wheeler, Glenda Wheeler and the Jacksons)

Count X  - Breach of Fiduciary Duty (Kevin Wheeler and Wheeler Realty)

Count XI  - Rescission (the Jacksons)

Count XII  - Declaratory Judgment that any recorded Deed reflecting the transfer of the Property from Kevin and Lolita Johnson to Patrick and Benita Jackson is void (the Jacksons)

Count XIII  - Declaratory Judgment that any Deed of Trust or other security interest recorded by American Home Mortgage as a result of their loan for the purchase of the Property is void (American Home Mortgage) [9]

Defendants have moved to dismiss all counts, adopting with minor variations each other's arguments. [10]

## IV.

## A.

Defendants make one across-the-board argument in support of their Motions to Dismiss.  The suit, they say, must be dismissed for want of an indispensable party under Federal Rule of Civil Procedure 19.  Specifically, they allege that Vivian E. Johnson, Kevin Johnson's

---

[9]

Based on the Escrow Agreement signed at settlement, Answer Title has filed a counterclaim seeking indemnification from the Johnsons against all losses or expenses, including attorneys fees, costs, and judgments incurred as a result of or in defense of the Johnsons' complaint.

The Johnsons have filed a Motion to Dismiss the Counterclaim.  For reasons that will become apparent in the course of this Opinion, the Court is unable to conclude at this juncture that Answer Title's Counterclaim is deficient as a matter of law.  Accordingly, the Johnsons' Motion to Dismiss the Counterclaim will be denied.

[10]

As of the time of oral argument, Terrell Sheppard, TLS Management, Inc. and Glenda Wheeler had filed no written Motion, but Sheppard and TLS Management appeared at the argument through counsel and Glenda Wheeler appeared in proper person.  Glenda Wheeler was given leave to address the Court orally and she, Sheppard and TLS Management were given leave to file written Motions to Dismiss adopting the arguments of the other parties.  Sheppard and TLS Management have since filed such a Motion; Glenda Wheeler has not.

mother, was a co-owner of the subject property, indeed she was a co-signatory on the Deed to the Jacksons.  Insofar as the Johnsons seek rescission, say Defendants, Vivian Johnson would be required to refund any and all monies paid to her in exchange for return of the property, which she may or may not be willing or able to do.  Further, say Defendants, the Johnsons have asserted monetary claims for damages allegedly "suffered by the sellers in the transaction," of which Vivian Johnson unquestionably was one.  Failure to include one of the three sellers in this suit, according to Defendants, would subject them to the risk of incurring "multiple or otherwise inconsistent obligations" if and when Vivian Johnson were to file suit at some other time on the same grounds.

The Johnsons reply (citing no authority) that if they succeed in their suit and the deed to the property is rescinded, the effect on Vivian Johnson would be the same whether or not she is a party, which is to say none at all.  They submit that since Vivian Johnson received no funds from the settlement, there is nothing for her to return.

## B.

Federal Rule of Civil Procedure 19 dealing with joinder creates a two-step inquiry:

First, the Court must inquire whether a party is "necessary" to a proceeding because of his or her relationship to the matter under consideration.

Second, if a party deemed necessary is unavailable, the court must consider whether the proceeding can continue in that party's absence.  If it cannot, the party will be deemed "indispensable" and the action must be dismissed.  *See* FED. R. CIV. P. 19(a)-(b).

Wright, Miller and Kane, <u>Federal Practice and Procedure</u>, citing several cases, suggests that:

Compulsory joinder of parties in actions involving real property
generally is governed by two factors:

> (1)     the kind of legal interest of various persons claiming the property; and
>
> (2)     the type of claim being asserted.
>
> \* \* \*
>
> A federal court should not hesitate to require joinder of absentees whose interest may be affected by the action or who otherwise are needed for a just adjudication of the dispute.
>
> \* \* \*
>
> But when all co-tenants will be affected by the judgment or when the absence of some of them will prevent complete justice from being rendered to everyone interested in the land, all the co-tenants must be joined.

7 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 1621 (3d ed. 2001).

The Court agrees with Defendants that Vivian Johnson could at some future date pursue litigation in her own behalf that might re-subject them to liability on causes of action identical to those prosecuted in the present case.  The Court further agrees that, insofar as rescission of the deed is sought, Vivian Johnson is a "necessary" party and therefore should be joined to these proceedings as Party Plaintiff if that is feasible.

Because Vivian Johnson, as Kevin Johnson's mother, is someone whose interests are presumably in harmony with his, it certainly appears that she is someone whose joinder is feasible, even if for some reason she is unwilling to enter the case voluntarily.  Accordingly the Court need not decide at this point whether Vivian Johnson is an "indispensable party" to the proceedings; her joinder – voluntary or involuntary – will moot that question.  The Court therefore will not dismiss

the case, but will grant the Johnsons leave to join Vivian Johnson as a Co-Plaintiff in this proceeding, which they should effectuate within the next 30 days.

## V.

### A.

In Count I of the Complaint, the Johnsons assert a claim under the federal RICO statute, which establishes civil liability for those who engage in a pattern of racketeering activities causing harm to another's business. *See* 18 U.S.C. §§ 1962, 1964 (2004). The Johnsons contend that all Defendants (other than American Home Mortgage) conspired to steal several thousand dollars from them and did so by means of the transaction previously described. The pattern of illegal activity allegedly consisted of Sheppard's contact with the Johnsons, his receipt of a kickback from the settlement, and Wheeler's misrepresentations and "theft" of approximately $56,800.

Defendants make a number of arguments which they contend support dismissal of the RICO count, among others, that the count fails to provide the specificity required by Federal Rule of Civil Procedure 9(b), [11] including a failure to specify any injuries caused by Defendants' alleged racketeering activities.

### B.

Under U.S.C. § 1964(c), "[a]ny person injured in his business or property by reason of a violation" of the RICO statute has a private right of action. Violation of § 18 U.S.C. 1962 requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496 (1985). A plaintiff must allege each of these

---

[11]

Federal Rule of Civil Procedure 9(b) provides, "In all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity."

elements to state a claim.  While it is true that Federal Rule of Civil Procedure 8(a)(2) requires that a pleader need only plead "a short and plain statement of the claim showing that the pleader is entitled to relief," it is also true that by alleging certain facts the pleader may end up pleading himself out of court.  *See, e.g.*, *Migdal v. Rowe Price-Fleming Int'l*, 248 F.3d 321, 326 (4th Cir. 2001) ("Rule 12(b)(6) . . . is not without meaning.  'The presence [] of a few conclusory legal terms does not insulate a complaint from dismissal under Rule 12(b)(6) when the facts alleged in the complaint' cannot support the legal conclusion."  (Citing *Young v. City of Mount Ranier*, 238 F.3d 567, 577 (4th Cir. 2001)).

Here the Court need only address one of the arguments Defendants adduce and that is that the Complaint on its face fails to allege a pattern of racketeering activities; in fact what it does allege clearly does <u>not</u> establish such a pattern.

This case involves two victims (a married couple) and a transaction that took place over a matter of a few weeks.  As the Fourth Circuit said in  *Menasco, Inc. v. Wasserman*, 886 F.2d 681, 683-85 (4th Cir. 1989), Congress contemplated that only a party engaging in widespread fraud would be subject to the serious consequences of the RICO statute.  The court noted the language of *H.J., Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229 (1989), to the effect that, to prove a pattern of racketeering activity, a plaintiff must show that the predicate acts are related, and that they "amount to or pose a threat of continued criminal activity."  *Id.* at 239.  Predicate acts of racketeering over a finite period of time that suggest no future criminal activity do not satisfy the continuity prong of RICO.  *GE Inv. Private Placement Partners II v. Parker*, 247 F.3d 543, 549 (4th Cir. 2001).

*Menasco* involved one set of victims and a transaction that took place over approximately a year, but the court declined to find a pattern of racketeering activity. In *Int'l Data Bank, Ltd. v. Zepkin*, 812 F.2d 149, 154-55 (4th Cir. 1987), the Fourth Circuit found no "pattern" in a single, limited fraudulent scheme which involved ten investors.

Those holdings are dispositive here.

Whatever the Johnsons believe Defendants may or may not have done to others in the past or what they may be disposed to do in the future is purely a matter of speculation.

For present purposes, the Johnsons have not alleged (nor based on what they have now said can they allege) a RICO violation.

Defendants' Motion to Dismiss Count I will be granted.

VI.

A.

In Count II, the Johnsons sue Sheppard, Kevin Wheeler and Glenda Wheeler for violation of the Real Estate Settlement Practices Act (RESPA), 12 U.S.C. § 2607 (2004). Section 2607(a) provides that, in federally related mortgage loans transactions, no person shall give or accept any fee, kickback or thing of value for business referrals relative to the real estate settlement service. Section 2607(b) provides that no person shall split any charge made for the rendering of real estate settlement services in connection with such transactions.

The Johnsons allege that Sheppard received a fee or kickback from Kevin Wheeler and/or Wheeler Realty and/or Glenda Wheeler for his referral relative to the transaction and that they were injured thereby.

The named Defendants again object on the grounds that the Johnsons have made only conclusory allegations with respect to their RESPA claim, saying they have failed to plead the details of the purported kickback scheme.  They also say that since the Johnsons have not alleged that they were overcharged for settlement costs, they were not injured.

B.

The Court finds that there are sufficient factual averments in the Complaint to support relief under RESPA.  This is particularly true in light of the fact that the HUD-1 Settlement Statement is appended to and incorporated into the Complaint.  As a result, the facts contained in the document constitute relevant averments under the Complaint. FED. R. CIV. PRO. 10(c) ("A copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes."); *see also Space Tech. Dev. Corp. v. Boeing Co.*, 209 F. App'x 236, 238 (4th Cir. 2006) ("This Court must also accept as true the facts set forth in the exhibits attached to the complaint.").  Those averments together with the averments in the body of the Complaint, clearly set forth that Sheppard/TLS Management  referred the Johnsons to Kevin Wheeler/Wheeler Realty who referred them to the Jacksons as well as to Glenda Wheeler and Answer Title. [12]  The HUD-1 Settlement Statement also

---

[12]

> Answer Title, for some reason, is not named as a Defendant in Count II.  It has taken the position in connection with other counts, in which it is named, that it cannot be held vicariously liable for the acts of Glenda Wheeler because Wheeler is not, as the Johnsons allege, an "employee" of Answer Title, she is an "independent contractor."  *See supra* note 5.  The case of course is at a preliminary stage and the mere fact that Answer Title denies an employment relationship with Glenda Wheeler does not suffice to entitle it to dismissal.  However, Answer Title has also filed an alternative Motion for Summary Judgment which is supported by an affidavit from an officer of Answer Title stating that Glenda Wheeler is not its employee.  In other words, Answer Title suggests that there is no genuine issue of material fact as to Glenda Wheeler's independent contractor status.  The Court notes, however, that the MOU between Glenda Wheeler and Answer Title, *see supra* note 5, contains indicia suggestive of at least an agency, if not an employment, relationship between Glenda Wheeler and Answer Title.  The HUD-1 Settlement Statement, for example, indicates that the settlement agent is Answer Title, and shows payment of all settlement services in favor of

arguably suggests kickbacks made pursuant to agreement among and between the named Defendants which carried the costs of settlement beyond what was reasonable to expect in connection with the ordinary transfer of a house title.  These would include the payment to Sheppard, the payments to Kevin Wheeler and KG Management, and the payment of $9,000 in closing costs to the Jacksons.

The $100,000 escrow payment to American Home Mortgage may also be actionable under RESPA.  True, there had been no title report as of the time of settlement and the concept of an escrow in light of that in and of itself is not problematic.  But arguably the $100,000 insisted upon by American Home Mortgage was arbitrary and unreasonable as to amount. [13]  The $100,000 also raises questions of possible illegal charges under RESPA as far as Glenda Wheeler and Answer Title are concerned.  This sum was held from March 17 until May 8, 2006, a total of 52 days.  According to the Escrow Agreement created by Answer Title, the sum was held in a non-interest bearing

---

Answer Title; there are no separate payments to Glenda Wheeler.  Moreover, Answer Title admits that it shares offices and rent with Glenda Wheeler on the premises of Wheeler Realty and regularly engages her to handle settlements.  Indeed the MOU states that Answer Title "will provide the marketing materials for this office and [Gloria Wheeler] will only use such materials or previously approved materials when marketing [Answer Title]" and that Glenda Wheeler and Answer Title will split the settlement fee, title insurance binder fee, title examination, title insurance premium and document preparation fee, in different proportions depending on the number of closings held each month.  Answer Title agrees to pay Glenda Wheeler a flat fee of $125 for closings held at Wheeler Realty and to pay "a $50 settlement fee discount to any [Wheeler Realty] agents who refer and close deals with [Answer Title]."

Apart from the possible illegality of some of these payments under RESPA, other facts that may be developed in the course of discovery could lead a trier of fact to conclude that, in connection with the Johnson transaction, Wheeler was acting as Answer Title's agent, which would in turn trigger Answer Title's vicarious liability for her acts.

In light of this, the Johnsons will be granted leave to add Answer Title as a Defendant in Count II.

[13]   Accordingly the Johnsons will also be given leave to add American Home Mortgage as a Defendant in Count II.

account subject to a handling charge of $50.00 in favor of Answer Title for the first six months that the escrow would be in existence.  A principal sum of $100,000 at the legal rate of 6% interest per annum results in per diem interest in the amount of $16.44.  Held for 52 days, as it was here, interest would total $854.80.  The Johnsons in effect lost that amount by reason of the escrow agreement imposed upon them. [14]

The inter-relationship alleged among and between the various Defendants named in Count II is sufficiently set forth in the Complaint as to provide fair notice that an agreement or scheme to assess potentially inappropriate charges under RESPA is being alleged.

The Court finds no basis for dismissal of Count II..

VII.

A.

The Court considers Counts III, IV and V of the Complaint collectively against the following background.

In response to what it viewed as growing mortgage foreclosure abuses, the Maryland Legislature adopted the Protection of Homeowners in Foreclosure Act of 2005 (HPIFA), MD. CODE ANN., REAL PROP. §§ 7-301 to -321 (Supp. 2006) [15]  The Act applies to "foreclosure consultants," *Id*. § 7-301(b); "foreclosure consulting services," *Id*. § 7-301(d); and "foreclosure purchasers," *Id*. § 7-301(e).  Basically, a "foreclosure consultant" or "foreclosure consulting service" must provide

---

[14]

Insofar as Glenda Wheeler and/or Answer Title may in any way have had use of the $100,000 during the escrow period or of any interest thereon, a separate claim under RESPA would arguably arise as well as a claim for breach of a fiduciary relationship.

[15]

The law was introduced as Senate Bill 761 by Senator Brian E. Frosh (D-Montgomery), Chairman of the Senate Judicial Proceedings Committee.

a "foreclosure consulting contract" to the homeowner in foreclosure that fully discloses the exact nature of the foreclosure and the consulting services to be provided, including the prospect of any foreclosure reconveyance to a "foreclosure purchaser" who may be involved, as well as the total amount of any compensation to be received by the foreclosure consultant or anyone working in association with the consultant. *Id*. § 7-306(a). The notice must be dated and personally signed by the homeowner and the foreclosure consultant and must be printed in certain large type, including a larger boldface setting forth the homeowner's rights.

The Act further provides that a foreclosure consultant may not receive any compensation until after he or she has fully performed each and every service that the foreclosure consultant contracted to perform or represented that he or she would perform. *Id*. § 7-307(1). Additionally, the foreclosure consultant may not receive any consideration from a third party in connection with foreclosure consulting services provided to a homeowner unless that consideration is first fully disclosed in writing to the homeowner, *Id*. § 7-307(4), nor may the foreclosure consultant induce or attempt to induce any homeowner to enter into a foreclosure consulting contract that does not comply in all respects with the Act, *Id*. § 7-307(7).

The homeowner may rescind the foreclosure consulting contract at any time. *Id*. § 7-305(a)(1).

A foreclosure purchaser, *i.e.* a person who acquires title or possession of a deed to a residence in foreclosure as a result of a foreclosure reconveyance, *Id*. § 7-301(e), is obliged to provide the homeowner with a document entitled "Notice of Transfer of Deed or Title," *Id*. § 7-310(a). That document must contain certain information as to the nature of the foreclosure reconveyance and must describe completely the terms related to the agreement designed to allow

the homeowner to remain in the home.  *Id*. § 7-310(b)(4)(vii).  The notice must also state, in at least 14 point boldface type, that the homeowner has the right to rescind the transfer of the deed or title to his property at any time within the next 3 days, following which, within 60 days, any money paid on behalf of the homeowner must be returned, along with interest calculated at the rate of 8% per year.  *Id*. § 7-310(b)(5).

The foreclosure purchaser must also supply a separate Notice of Right to Cancel Transfer of Deed or Title to the homeowner.  *Id*. § 7-310(c)**.**  During the 3 day rescission period, a deed affecting title to the homeowner's residence may not be recorded.  *Id*. § 7-310(k).

Further, among other things, a foreclosure purchaser may not enter into a foreclosure reconveyance with the homeowner, which includes a leaseback of the property, unless the foreclosure purchaser verifies and can demonstrate that the homeowner has or will have a reasonable ability to make the established lease payments within the term of the lease.  *Id*. § 7-311(b)(1)(i). Additionally the foreclosure purchaser may not enter into lease terms as part of the foreclosure conveyance that are "unfair or commercially unreasonable, or engage in any other unfair conduct." *Id*. § 7-311(b)(3).  Finally, the foreclosure purchaser may not record any document, including an instrument conveyed and signed by the homeowner, until the homeowner's right to rescind has expired, the time for the exercise of which does not begin to run until the foreclosure purchaser has complied with the notice provisions of the law.  *Id*. § 7-310.

A *bona fide* purchaser for value who enters into a transaction with a homeowner when a foreclosure consulting contract is in effect will receive good title to the property free and clear of the right of the parties to the foreclosure consulting contract or the right of the homeowner to rescind the foreclosure reconveyance.  *Id*. § 7-311(e).

A homeowner may bring a private action for damages against anyone who commits a practice prohibited by the Act, and recover treble damages if the defendant has willfully or knowingly violated the Act, as well as reasonable attorneys fees. *Id*. § 7-320. [16]

B.

The Johnsons allege that they were "homeowners" within the meaning of MD. CODE ANN., REAL PROP. § 7-301(i) (Supp. 2006) and that their property was a "residence in foreclosure" as defined by § 7-301(j). They allege that Sheppard was a "foreclosure consultant" as defined in § 7-301(b)(iii); that Kevin Wheeler was also a "foreclosure consultant" within the meaning of that provision; and that the Jacksons were "foreclosure purchasers" as defined by § 7-301(e).

The Johnsons contend, *inter alia*, that neither Sheppard nor Wheeler ever provided them with a foreclosure consulting contract, that the Jacksons never provided the notices required of them as foreclosure purchasers and that the lease agreement effectuated by the Jacksons through Wheeler contained terms that were unfair and commercially unreasonable. [17]

While the Defendants sued in these counts concede that no foreclosure consulting contract was ever executed by any of them nor any documents required by the Act furnished, they say that they were not required to do so because they are not covered by the Act. The Court considers these responses.

1)   Sheppard has made no separate argument on his own behalf, but has only sought to piggyback on the motions filed by the other Defendants. No Defendant, however, contends that

---

[16]

In addition, the Maryland Attorney General may bring criminal charges against violators. *See* MD. CODE ANN., REAL PROP. § 7-310 (Supp. 2006).

[17]

The Johnsons do not, however, allege that the Jacksons failed to determine their ability to make payments on the lease, a point the Court will return to presently.

Sheppard was not a "mortgage foreclosure consultant." [18]  Accordingly, at least at this stage of the proceedings, that allegation remains unchallenged.

2)   Kevin Wheeler's response is that he is not covered by the Act because he is a "person licensed as a real estate broker" or "real estate sales person," exempted as such under 7-302(a)(8) of the Act. [19]  Moreover, he says, the law defines a "foreclosure consultant" as a person who "solicits or contacts a homeowner in writing, in person . . . and directly or indirectly makes a representation or offer to," among other things, stop a foreclosure sale, save the homeowner from foreclosure, or arrange for the homeowner to become a lessee or renter entitled to continue to reside in the homeowner's residence, § 7-301(b)(1), (1)(i), (1)(vi), (1)(x).  Since Wheeler submits that he did not solicit the Johnsons, they came to him, he argues he is not covered by the Act.

For their part, the Jacksons contend that the Johnsons have failed to allege (1) that the Jacksons had actual knowledge that a foreclosure consulting contract existed; (2) that the

---

[18]

Again, for some reason TLS Management and Wheeler Realty are not named as Defendants in this count, but in view of the Court's ruling, the Johnsons are given leave to join them as such.

[19]

MD. CODE ANN., REAL PROP. § 7-302 (Supp. 2006) provides as follows:

§ 7-302.  Applicability of subtitle

(a) *To whom it does not apply*. – Except as provided in subsection (b) of this section, this subtitle does not apply to:

. . .

(8) A person licensed as a real estate broker, associate real estate broker, or real estate salesperson under Title 17 of the Business Occupations and Professions Article, while the person engages in any activity for which the person is licensed under those provisions so long as any conveyance or transfer of deed, title, or establishment of equitable interest is done through a settlement as defined in § 7-311(a)(5) of this subtitle . . . .

Johnsons suffered any compensable injury by reason of the Jacksons' failure to provide certain documents; (3) that the terms of the leaseback were unfair and commercially unreasonable; (4) or that the Johnsons suffered any damage as a result of the Jacksons' alleged recordation of documents signed by the Johnsons prior to the expiration of the Johnson's right to rescind.  The Jacksons also submit that there is no legal basis to claim punitive damages against them.

The Johnsons reply that their averments clearly suffice to sustain actions against Sheppard, Wheeler and the Jacksons under the HPIFA.

Sheppard, they say, called them out of the blue, solicited them in person, offered to stop, enjoin or delay the foreclosure sale, § 7-301(b)(1)(i); to assist them to obtain a loan or advance the funds, *Id*. § 7-301(b)(1)(vi); and to save their residence from foreclosure, *Id*. § 7-301(b)(1)(viii). He functioned, therefore, as a "mortgage foreclosure consultant," and because he did not give the Johnsons the requisite foreclosure consulting contract he violated the Act.  Again, this averment has not been challenged and in any event the Court finds it sufficient.

Similarly, according to the Johnsons, Wheeler represented that he would stop, enjoin or delay the foreclosure sale; save their residence from foreclosure; and arrange for them to become lessees or renters entitled to continue to reside in their own residence. § 7-301(b)(1) *passim*.  And while Wheeler's defense is that he did not contact the Johnsons, they contacted him, it is nonetheless implicit in the Complaint that Sheppard at all relevant times was acting for or on behalf of Wheeler and/or Wheeler Realty in soliciting the Johnsons.   Therefore, even based on the Wheeler theory of defense, the Johnsons argue that a cause of action under the Act has been properly stated against him.  The Court agrees that Wheeler and Wheeler Realty can be held in violation  if Sheppard is

found to have acted as their agent or in some material respect on their behalf, and that the Complaint fairly alleges that he so acted. [20]

The Court, moreover, does not read the Act to mean that "mortgage foreclosure consultants" only include persons who happen to initiate contact with homeowners. By that narrow reading, a *de facto* mortgage foreclosure consultant could engage in the most piratical practices targeted by the law and avoid liability simply because the homeowner made the first contact with the *de facto* foreclosure consultant and was not otherwise solicited or contacted in the first instance by the *de facto* consultant. Section 7-301(b) can and must be read more expansively. It defines a foreclosure consultant as one who "solicits or contacts" a homeowner . . . and directly or indirectly makes representation or offer to perform any service that will stop, enjoy, delay, void, etc. the foreclosure sale. "Solicit" may mean "to seek to influence or incite to action,"  as suggested by RANDOM HOUSE WEBSTER'S UNABRIDGED DICTIONARY 1816 (2d ed. 1999), which unquestionably connotes that the initial action has to be taken by the party doing the soliciting. But, in contrast, "contact" has a broader connotation, *i.e.* while it may well suggest an initial communication that proceeds from one person to the other, it also suggests interaction during subsequent communications, *i.e.* "contacts" after the parties have first entered into communication with one another. *See id.* at 437 (defining "contact" as "a condition in which two or more individuals or groups are placed in communication with each other"). To interpret the words "solicit" and "contact" as having identical meaning in the statute, as Wheeler/Wheelter Realty would have it, is

---

[20]

At oral argument, argument centered on whether Sheppard may have been acting as Wheeler's "agent." The Court, however, does not read the Act to require that a formal agency relationship must be established between who one "solicits" and one who provides the mortgage consulting service, in the sense of the Restatement of the Law of Agency. It is enough under HPIFA if the soliciting person merely acts on behalf of the service provider.

implausible.  Each word in a statute should be read to have its own meaning, and an identity of meaning of two or more words is not likely what the Legislature intended.  *See United States v. Nordic Village*, 503 U.S. 30, 36 (1992) ("a statute must, if possible, be construed in such fashion that every word has some operative effect"); *accord United States v. Brock*, 211 F.3d 88, 92 (4th Cir. 2000).  Reading the statute thus, in addition to the allegation that Sheppard solicited the Johnsons on behalf of Kevin Wheeler/Wheeler Realty, the Complaint also states that at some point Wheeler did in fact "contact" the Johnsons and offer to stop the foreclosure, save them from foreclosure, and arrange a sale and leaseback of the property – all acts that would establish Wheeler as a "mortgage foreclosure consultant" subject to the HPIFA.

Finally, Wheeler's argument that he is a "real estate salesperson" or "mortgage broker" exempt from the Act is obviously not conclusive, at least not at this stage of the proceedings.  At one time or another during his relationship with the Johnsons, Wheeler may have functioned as such, but that would not exempt him insofar as at other times during the transaction he may have functioned as a "mortgage foreclosure consultant."  Whereas the typical "real estate salesperson" may help find a buyer for a property and a "mortgage broker" may help find a lender, less typically would one and the same person or entity offer to stop a foreclosure, find a buyer and a lender, pick a blood relative who is an officer of his real estate company to conduct the settlement, take a sales commission from the sellers, transfer virtually all closing costs to the sellers, immediately turn around at settlement and represent the purchasers in leasing the property back to the sellers, take a $59,000 one-year management fee upfront from his former clients for the property he has just helped them sell, and into the bargain establish a lease payment in favor of the new purchaser/lessor and against his former clients in an amount in excess of $3,200 per month.  It remains to be seen whether

a jury, which will be given a full opportunity to do so, finds that at critical times in this transaction Wheeler (or Wheeler Realty) functioned as a "mortgage foreclosure consultant" subject to the Act, as opposed to a "real estate salesperson" or "mortgage broker" exempt under the Act.

          3)   The gist of the Jacksons' response is that the Johnsons have failed to allege that the Jacksons had actual knowledge that a foreclosure consulting contract existed because, in fact, they (The Jacksons) were *bona fide* purchasers entitled to receive title to the property free and clear. The Jacksons further allege that the Johnsons have suffered no damages as a result of the recordation of the land documents signed by the Johnsons; that in any event whatever right to rescind the Johnsons may have had has expired; and that the averments of the Complaint are insufficient to establish that the terms of the leaseback were unfair or commercially unreasonable. Finally the Jacksons argue that there is no basis for a claim of punitive damages under the HPIFA.

          The Johnsons argue and the Court agrees that there are ample averments suggesting that the Jacksons were other than *bona fide* purchasers for value. Again, what the Jacksons overlook are the documents appended to the Complaint, which on their face raise serious questions as to their *bona fides*. In very short order, the Jacksons were brought in as purchasers by Wheeler, who the Johnsons say (and who at least two documents arguably indicate) was supposed to be functioning as the Johnsons' real estate agent. Yet the Jacksons contend that at all times Wheeler was acting as their agent as, indeed, his subsequent representation of them through KG Management Company in connection with the leaseback also suggests. The Jacksons say this despite the fact that the HUD-1 Settlement Statement has the Johnsons, not the Jacksons, paying Wheeler's sales commission. Moreover, the Jacksons were beneficiaries of extraordinary largesse in the part of Wheeler. The Settlement Statement assigns virtually all closing costs to the Johnsons, not only 100% of the

transfer taxes, but also what would ordinarily seem to be costs properly attributable to the Jacksons, including the cost of their title insurance.  A trier of fact might also consider this cost shifting by someone ostensibly acting as the Johnson's agent sufficiently out of the ordinary as to cast doubt on any claim that the Jacksons were *bona fide* purchasers.

There are additional considerations.  Prior to settlement, the Jacksons had obviously engaged Wheeler through KG Management to be the manager of the property they proposed to purchase, establishing through him that the Johnsons would make leaseback payments to them of $3,452 per month, approximately $41,424 per year.  Discovery may very well establish that the median monthly rent for a private home in Clinton, Maryland bears no reasonable relation to the $3,452 assessed in this case, which would further call into question the Jacksons' *bona fides*.  Additionally, comparing from the HUD-1 statement the amount of cash that the Jacksons were required to come up with at settlement ($41,614) with the amount of rent that they proposed to recoup in one year under the leaseback ($41,424) is telling.  Arguably, they arranged to place themselves in a position to make back in a year (albeit subject to income tax) almost exactly what they were required to put down at settlement, reaping the benefit of a virtually cash-free transaction.  This, too, goes to the issue of the Jacksons' *bona fides*.

There may be more.  The lease attached to the Complaint contains information suggesting that, at a minimum, the Jacksons should have been aware of the suspect nature of the transaction and the potentially unfair and commercially unreasonable rent charged in the lease.  The Court does not have before it the EMC mortgage that the Johnsons held and was foreclosed upon.  But the total arrearage was some $210,000.  On the assumption that the full $210,000 was principal only (a generous assumption, since accrued interest and late charges were obviously added in), the

monthly payment – assuming an 8% interest rate over a 30 year fixed term – would only be $1,500. If that was the amount of the monthly payment that the Johnsons were unable to make and which led them into foreclosure, how reasonable then would it have been require them to make a monthly payment on the leaseback of $3,452, more than double that amount?

As for the claim that the Johnsons have not alleged damages as a result of the Jacksons' recordation of the documents prior to the expiration of the Johnsons' right to rescind, the answer is simple enough.  The Johnsons are seeking to rescind the contract based on the fact that they never received from the Jacksons the information that they were entitled to receive under the HPIFA.  The Act expressly establishes that the 3-day period for rescission does not begin to run until notice is properly given under the Act.  MD. CODE ANN., REAL PROP. § 7-310(e) (Supp. 2006). Accordingly, the clear implication if the Complaint is that the Johnsons were damaged when they lost their home by reason of the transfer that was effected to the Jacksons.  It is true, as the Jacksons say, that the Johnsons were in foreclosure and might have lost their home in any event.  But had they gone forward with the foreclosure, the Johnsons still would have been entitled to all the proceeds over and above the amount of the first trust and the costs of the foreclosure sale.  There would have been no payments to Sheppard/TLS Management, none to Wheeler/Wheeler Realty/KG Management and none to the Jacksons, as occurred here, all arguably damages sustained by the Johnsons.

This said, however, there is one matter on which the Court does concur with the Jacksons.  The HPIFA does not speak in terms of punitive damages and the Court finds no basis to award damages in connection with that statute.  Indeed a homeowner's entitlement to treble damages

is predicated on a finding that a defendant "willfully or knowingly" violated a provision of the Act, precisely the predicate that ordinarily underlies an award of punitive damages. *Id.* § 7-320(c).

The Court will therefore grant the Jacksons' Motion as to Count V insofar as the Johnsons seek punitive damages.  In all other respects, their Motion to Dismiss Count V will be denied.

## VIII.

In Count VI, the Johnsons allege that Kevin Wheeler, Wheeler Realty, KG Management, Sheppard, TLS Management, Glenda Wheeler and Answer Title violated the Maryland Consumer Protection Act by making false and misleading statements to the Johnsons, in violation of MD. CODE ANN., COM. LAW § 13-301(1) (2003) and by failing to state a material fact intended to deceive them in violation of MD. CODE ANN., COM. LAW § 13-301(3).

Insofar as Wheeler and Wheeler Realty argue they were acting as "real estate brokers" or "real estate salespersons" and are thus exempt under § 13-104(1) of the Act, the Court has already pointed out that, at least at some points in this transaction, Wheeler/Wheeler Realty are alleged to have acted beyond the scope of "real estate broker," "real estate salespersons," hence they would be covered by the Act.

Answer Title, however, makes a more persuasive argument, which has been adopted by all Defendants.  It points out that the allegations in the Complaint do no more than quote pertinent language of the Maryland Consumer Protection Act and because fraud is at the heart of Defendants' alleged violations of the Act, Federal Rule of Civil Procedure 9(b)'s requirement of particularity in the pleading of fraud must apply.  That means that the Johnsons are obliged to identify with some precision the date, place and time of active misrepresentations or the circumstances of active

concealments, specifying which Defendant or Defendants is or are supposedly responsible for those statements or omissions. *See e.g. Kerby v. Mortgage Funding Corp.*, 992 F. Supp. 787, 799 (D. Md. 1998) ("the requirement of 'particularity' does not require the elucidation of every detail of the alleged fraud, but does require more than a bare assertion that such a cause of action exist") (citing *Mylan Laboratories, Inc. v. Akzo, N.V.*, 770 F. Supp. 1053, 1074 (D. Md. 1991).

The Court agrees with Defendants.

If indeed the Johnsons have specific active misrepresentations or omissions in mind, fairness requires that they state them with considerably greater particularity than they have done in their Complaint. The Motion to Dismiss Count VI therefore will be granted, but without prejudice. The Johnsons shall have leave to file an Amended Complaint stating this cause of action with greater particularity, if they are able to do so.

## IX.

In Count VII the Johnsons allege common law fraud against Sheppard, Kevin Wheeler, Glenda Wheeler and the Jacksons.

This count suffers from the same deficiencies discussed in connection with Count V, the Maryland Consumer Protection Act count.

Accordingly, this count will also be dismissed without prejudice, but the Johnsons are granted leave to amend in similar fashion to that permitted in connection with Count V.

## X.

In Count VIII, the Johnsons contend that Sheppard, Kevin Wheeler, Glenda Wheeler and the Jacksons conspired to commit numerous violations of federal law, presumably of RICO and RESPA, and they also allege that Defendants conspired to violate Maryland law, including

conspiracy to commit fraud; conspiracy to commit conversion; and conspiracy to violate Maryland's real estate laws, presumably the HPIFA.

Defendants argue and the Court agrees that the civil conspiracy count must be dismissed, at least temporarily, until such time as the Johnsons can refine their pleading as to this count.

The Johnsons, it is true, do not within this particular count expressly allege the usual elements for an action of conspiracy, namely that:

(1)     Two or more persons by agreement or understanding;

(2)     Agreed to commit some unlawful tortious act or to use unlawful or tortious means to accomplish an act not in itself illegal; and

(3)     Actual legal damage resulted to the plaintiff.

*See, e.g.*, *Van Royen v. Lacey*, 277 A.2d 13, 14 (Md. 1971).  What the Johnsons do, rather inconveniently it must be said, is to incorporate by reference all allegations that precede Count VIII, so that, for example, at paragraph 46 of the Complaint within Count I (the RICO count), there is an averment that the various Defendants "designed, formulated, organized, implemented, entered into, operated and controlled a scheme, plan and conspiracy to commit unlawful acts to defraud the Johnsons," language which might satisfy the element of confederation of two or more persons by agreement.  Similarly in connection with other counts where the Court has already indicated the extent to which unlawful acts under RESPA or the HPIFA may have occurred, that might satisfy the second element of an action for civil conspiracy.  Finally the Johnsons have unquestionably alleged legal damage resulting by reason of these acts.

Even so, since the Court has now dismissed the RICO count, it will be necessary for the Johnsons to replead the civil conspiracy count (incorporating language of the sort just referred to) in connection with those counts where the underlying cause of action has not been dismissed.

Accordingly, unless facts relative to the fraud count can be pled with sufficient particularity as the Court has indicated, there can be no count for conspiracy to commit the fraud, since conspiracy alone is not actionable. *Id.*

Further, for reasons that will be set forth presently, there can be no action for civil conspiracy to commit conversion since no actionable conversion has been pled in this case.

The Court will, therefore, grant Defendants' Motion to Dismiss Count VIII without prejudice. The Johnsons are granted leave to re-file a civil conspiracy count, but only as may be consistent with all the Court's rulings herein.

## XI.

In Count IX, the Johnsons allege that all Defendants took possession of funds belonging to the Johnsons and converted them to their own use. Defendants argue that the conversion claim fails because money cannot be converted. *See, e.g.*, *Darcars Motors of Silver Springs, Inc. v. Borzym*, 841 A.2d 828, 834, n.3 (Md. 2004) ("As a general rule, money, i.e. currency, is not subject to a claim of conversion unless a plaintiff seeks to recover specific segregated or identifiable funds"). The Court agrees with Defendants. Here the Johnsons are seeking monetary damages, but not the return of specific funds that are being held separate and apart.

The Motions to Dismiss Count IX are granted with prejudice.

## XII.

In Count X, the Johnsons sue Kevin Wheeler and Wheeler Realty for breach of fiduciary duty.  They allege that, acting as the Johnsons' "realtor" (presumably they mean "real estate agent" or "real estate broker"), Wheeler and Wheeler Realty owed them a fiduciary duty to act in a matter consistent with their best interests.  Further, they say, the Wheeler Defendants breached their fiduciary duty by committing the unethical and fraudulent acts referred to in the previous counts, with resultant damage to the Johnsons.

Defendants' liability is premised on Section 17-532 of the Business Occupations and Professions Article of the Maryland Code, which sets forth the duties of a licensed real estate broker to his or her client. [21]  In addition, the common law establishes that a real estate agent or broker stands in a fiduciary relationship with his client.  *See, e.g.*, *Proctor v. Holden*, 540 A.2d 133, 141 (Md. Ct. Spec. App. 1988).

Defendants respond that they were never acting on behalf of the Johnsons, only on behalf of the Jacksons, and point to a form attached to the Complaint which sets out the purported understanding of the parties as to whom the real estate agent represents.  That form, which is dated

---

[21]

A [real estate brokerage] licensee shall:

. . .

(iii)    disclose to the client all material facts as required under § 17-322 of this title [*inter alia* prohibiting wilful misrepresentations or false promises, negligent non-disclosure of material facts relating to property, acting as a dual agent without obtaining written informed consent of all parties];

(iv)    treat all parties to the transaction honestly and fairly and answer all questions truthfully.

MD. CODE ANN., BUS. OCC. & PROF., § 17-532(c)(1) (2003).

the same day as the settlement and which, according to counsel, was handed to the Johnsons and signed by them moments before settlement began, does have one box checked which suggests that the Johnsons were "buyers/tenants."  But the same form has another box checked indicating that Wheeler and Wheeler Realty were acting as "seller/landlord's agent."  The Jacksons, most certainly, were never "sellers," while the Johnsons, of course, were.  Apart from the fact that this document is at best confusing, especially given that it was handed to the Johnsons for the first time as settlement was taking place, the Johnsons have made a series of allegations relative to their contact with Wheeler prior to settlement in which they say he promised to find them a buyer and save them from the foreclosure.  Finally, and again most persuasively, the HUD-1 Settlement Sheet shows that the Johnsons (not the Jacksons) paid the sales commission to Wheeler.  To that extent, of course, a trier of fact could find that at relevant times Wheeler/Wheeler Realty was functioning as the Johnsons' agent and was not, therefore, permitted to take actions (such as transferring $9,000 of the Jacksons' closing costs to the Johnsons) inconsistent with the Johnsons' best interest.

In sum, the allegations of Count X suffice to establish a claim for breach of fiduciary duty, either statutorily or under the common law.

Arguably at this point in the relationship, Wheeler/Wheeler Realty was acting as the Johnsons' real estate agent, even though at other times he/they may have functioned as mortgage foreclosure consultants. [22]

---

[22]

The Court notes that insofar as proof of Wheeler's status as a "real estate agent" for purposes of the present count may be inconsistent with his exempt status as such under the HPIFA or the Maryland Consumer Protection Act, nothing prevents a pleader from pleading inconsistently. FED. R. CIV. PRO. 8(e)(2) ("A party may . . . state as many separate claims . . . as the party has regardless of consistency . . . .").

**XIII.**

Count XI is a claim for rescission against the Jacksons based on the allegation that the Johnsons were induced to assent to the contract of sale by fraud and misrepresentation on the part of the Jacksons.  The Court shares the uncertainty of the Jacksons as to the legal theory the Johnsons are pleading here; perhaps the Johnsons intend for it to be the equitable remedy of rescission which, to be sure, is a basis to invalidate or void a deed.  *See, e.g.*, *Cromwell v. Sharon Bldg. & Loan Ass'n, Inc.*, 152 A.2d 548 (Md. 1959).  But insofar as fraud is alleged, say the Jacksons, this Count is deficient for the same reason that the earlier fraud counts are deficient, namely that fraud has not been alleged with sufficient particularity.

The Jacksons also submit that the claim must fail because the Johnsons are apparently bringing their rescission claim under the HPIFA, which sets forth the exclusive remedies for violation of the statute and which purportedly does not provide for the remedy of rescission.

While the Court agrees with the Jacksons that the allegations underlying rescission based on fraud are inadequate, to the extent that the Johnsons intend to bottom their claim for rescission on the HPIFA, there is, in sharp contrast to what the Jacksons contend, a theory by which rescission might be pursued.  Real Property Article § 7-310(e) provides that "the time during which the homeowner may rescind the contract or transfer does not begin to run until the foreclosure purchaser has complied with" the obligations of the foreclosure purchasers.  Insofar as the Jacksons may ultimately be found to be "mortgage foreclosure purchasers" within the meaning of the Act, and insofar as they may be found not to have complied with this section, it may fairly be argued that the time for rescission never began to run.

The Court suggests, however, for the sake of clarity that the Johnsons may wish to amend their claim for rescission under Count XI and the Court will grant them leave to do so.

**XIV.**

Count XII is a claim for declaratory judgment against the Jacksons which asks the Court to declare that the deed recorded by them is void, inasmuch the HPIFA, MD CODE ANN., REAL PROP. § 7-311(b)(6) (Supp. 2006), prohibits the recordation of any documents prior to the expiration of the applicable rescission period.

The Jacksons argue that the Johnsons have alleged no facts supporting the allegation that they recorded any documents prior to the expiration of the applicable rescission period, but in any event that the HPIFA does not provide for declaratory judgments.  The Court disagrees.

The Johnsons have unquestionably alleged sufficient facts to put the Jacksons on notice as to what they are claiming.  They expressly plead that the deed went to record.

As for declaratory relief, the issue is not whether the HPIFA provides for it, but whether the Federal Declaratory Judgment Act does.  The Federal Declaratory Judgment Act provides that "in a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201 (2004).  The Act is procedural in nature and is meant to expedite and simplify the ascertainment of uncertain rights.  Accordingly it is to be liberally construed.  *See Cloomes v. Adkinson*, 414 F. Supp. 975, 984 (D.S.D. 1976).  At the same time, under Maryland's Uniform Declaratory Judgment Act "[a]ny person interested under a deed . . . whose right, status or other legal relations are affected by a statute . . . [or] contract . . .

may have determined any question . . . arising under the . . . statute . . . [or] contract ... and obtain a declaration of rights, status or legal relations under it."  MD. CODE ANN., CTS & JUD. PROC. § 3-406 (2003).  It follows, therefore, that a federal court, insofar as it otherwise has jurisdiction over the parties, is equally authorized to entertain a declaratory judgment action involving the construction of a deed.

The Court understands that in this count the Johnsons are proposing an alternative remedy to their count for rescission, which is to say that the Court should declare the deed executed to the Jacksons void.  Alternative pleading is permitted, just as is inconsistent pleading.  Fed R. Civ. Pro. 8(e)(2) ("A party may set forth two or more statements of a claim . . . alternately or hypothetically, either in one count . . . or in separate counts . . . .")

The Jacksons' Motion to Dismiss Count XII is denied.

## XV.

In Count XIII, the Johnsons seek declaratory relief against American Home Mortgage again on the grounds that the HPIFA, MD CODE ANN., REAL PROP. § 7-311(b)(6) (Supp. 2006), prohibits the recordation of any documents prior to the expiration of the applicable rescission period and therefore any deed of trust or other security instrument recorded by American Home Mortgage as a result of its loan for the purchase of the property is void.  American Home Mortgage has filed a Motion to Dismiss and – without leave of court – an Amended Motion to Dismiss and alternatively for Summary Judgment.  The gist of the original motion is that the Complaint is devoid of allegations that American Home had notice of any foreclosure consulting contract or the existence of any rescission period with respect to it.  The Amended Motion to Dismiss adds that American Home Mortgage is a "licensed mortgage lender" in Maryland and, as such, exempt from the HPIFA.

The Johnsons point to averments in the Complaint suggesting that Answer Title and Glenda Wheeler were engaged to act as agents for American Home Mortgage and that both were well aware of the pending foreclosure proceedings involving the Johnsons, such that through them American Home Mortgage also had notice.  The Court finds this to be a fair inference.  Answer Title and Glenda Wheeler took affirmative steps on behalf of American Home Mortgage to clear title to the property, according to the Johnsons.  The fact that American Home Mortgage insisted on the $100,000 escrow and went to settlement without first obtaining a title report also arguably suggests that it knew that a foreclosure was in process and that a transaction was underway to forestall it. [23]

As for American Home Mortgage's suggestion that it is exempt from the HPIFA because it is a "mortgage broker," the Johnsons respond that whether or not it is a "mortgage broker," the HPIFA allows for the voiding of the deed to the Jacksons and since American Home Mortgage's deed of trust depends entirely upon the validity of the deed to the Jacksons, American Home Mortgage's deed of trust is void if the deed to the Jacksons is void.  This is a plausible argument.

That said, however, the possibility remains that American Home Mortgage may be entitled to assert an equitable lien in some amount – at least to the extent that cash from its loan

---

[23]   The Court notes that the First Deed of Trust in favor of American Home Mortgage provides at Paragraph 6 that the Borrowers (the Jacksons) "shall occupy . . . the Property as Borrower's principal residence within 60 days after execution of [the Deed of Trust] and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing. . . ."  The fact that American Home Mortgage in advance of closing may have approved the proposed immediate leaseback of the property to the Johnsons would also suggest that they had notice of the imminent foreclosure.  On the other hand, insofar as the Jacksons may not have disclosed to American Home Mortgage the proposed leaseback to the Johnsons, that arguably bears on the issue of whether the Jacksons were *bona fide* purchasers for value of the property.  *See* discussion *supra* Part VII:B.

ended up in the hands of the Johnsons and possibly to a greater extent insofar as certain charges at settlement were properly assignable to the Johnsons. *See, e.g.*, *Scott v. White*, 58 A.2d 490, 491 (Md. 1948).

For now, the Johnsons' claim for declaratory relief against American Home Mortgage will stand. American Home Mortgage, by way of counter-claim, shall have leave to pursue a claim for an equitable lien.

## XVI.

The Court will enter a separate Order consistent with this Opinion.

---
                                    **/s/**
                        _____
                        **PETER J. MESSITTE**
**May 30, 2007**            **UNITED STATES DISTRICT JUDGE**